FILED

2011 Oct-13  AM 10:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PETRU-AURELIAN SIMIONESCU, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:10-cv-01518-WMA |
| | } | |
| BOARD OF TRUSTEES OF THE | } | |
| UNIVERSITY OF ALABAMA, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendant, the Board of
Trustees of the University of Alabama, for its division, the
University of Alabama at Birmingham (hereinafter "UAB"), for
summary judgment as to all claims brought by plaintiff, Dr. Petru-
Aurelian Simionescu ("Dr. Simionescu").  Doc. 48.  Dr. Simionescu,
who is proceeding *pro se*, brings claims against his former employer
UAB for gender and national origin discrimination in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et
seq.* ("Title VII").  For the reasons set forth below, UAB's motion
for summary judgment will be granted in its entirety.

### FACTS[1]

UAB hired Dr. Simionescu, a male of Eastern European descent,
as an assistant professor in the Department of Mechanical
Engineering within the UAB School of Engineering, effective June

---

[1] Because of the procedural posture, all facts are viewed in
the light most favorable to Dr. Simionescu.

15, 2007.  When Dr. Simionescu was hired, the faculty recruitment request for his position showed that 50 percent of his effort was to be devoted to teaching, and the remaining 50 percent devoted to a combination of research and service.  Dr. Simionescu was hired on a nine-month appointment in a tenure-track position, and he reported to his department chair, Dr. Bharat Soni ("Dr. Soni"), the entire time he was employed at UAB.

During his first academic year at UAB, Dr. Simionescu, often referred to as "Dr. Bob" by his students and colleagues, was the subject of numerous complaints and negative feedback from his students, a fact that he admits.  For each class he taught, he received anonymous student evaluations, the majority of which were comprised of negative comments.[2]  Additionally, several of his

---

[2] These unfavorable student comments include the following: "This teacher did not explain material well and was very hard to follow.";"Without a doubt the worst professor I have ever had. . . . He has yet to do a single example problem in class that [is] not completely wrong.  He is worthless in answering students questions, both in class and in his office."; "Dr. Bob is one of the worst teachers I have ever had in college.  When a student asks him a question he either blows them off or comes across mad at the student.  Dr. Bob is also no help during office hours."; "Dr. Bob is by far the most unorganized teacher I have ever had! He [sic] teaching methods are terrible.  He needs to learn how to structure his notes.  He skips over people if they have questions in class and just keeps going on thru the material even if the majority of the class does not understand it.  He needs to take classes on how to teach."; "This teacher did not teach material well and was hard to follow.  I've never had such a hard time understanding material."; "The instructor seemed to make the course more difficult by the way he presented the material."; "Worst Engineering instructor I have ever had."; "Found the course hard to follow.  Many mistakes were made in the process of working examples on the board and when presenting new material.";

students complained about his teaching to Dr. Soni as well as to two of Dr. Simionescu's colleagues in the Department of Mechanical Engineering: Dr. Sally Anne McInerny ("Dr. McInerny"), a female full professor, and Dr. Tina Oliver ("Dr. Oliver"), a female instructor.[3]   The students who complained—Sanjay Malkani, Kevin Holland, Lawrence T. Korneghy, and Ronald Scott Mayfield—told Drs. Soni, McInerny and Oliver that they had difficulty following and understanding Dr. Simionescu, partly due to the fact that he has difficulty speaking English, complained about his choice to use a textbook that he co-authored and notes that he wrote for one of his classes, and stated that he was inconsistent in grading, disorganized, did not communicate effectively, and was disrespectful to students.   Dr. Simionescu believes that Drs. Soni, McInerny and Oliver instigated these student complaints in a concerted effort to have him terminated, but he has admitted that he has no personal knowledge that this actually happened, and all three professors have denied it.

Dr. Simionescu received only one performance evaluation by his department chair while he was employed by UAB, in May 2008, and he received a poor ranking for his teaching effectiveness—a 1.5 out of 4.   Dr. Simionescu signed his evaluation on July 2, 2008.

---

"This course was a disaster."; "This course was terrible!  The syllabus was not followed at all."

   [3] Dr. Oliver was promoted to assistant professor after Dr. Simionescu was no longer employed at UAB.

On December 29, 2008, UAB notified Dr. Simionescu that his employment would be terminated after one year.  In the termination letter, UAB's stated reasons for terminating Dr. Simionescu were his continuous poor teaching performance and complaints from students regarding his teaching.  The letter also points to the fact that Dr. Simionescu's students had rated his instruction in the bottom (0-10) percentile in their evaluations.  Dr. Simionescu remained employed by UAB from December 29, 2008, to December 31, 2009, and he continued to be paid.  However, he had no further teaching responsibilities after receiving his letter of termination.  Dr. Simionescu went from UAB directly to employment with Texas A & M University at Corpus Christi in January 2010.

On June 15, 2010, Dr. Simionescu filed the complaint in the instant case against UAB, and other individual defendants who have since been dismissed, alleging that UAB terminated his employment due to gender and national origin discrimination in violation of Title VII.  UAB filed its motion for summary judgment on July 19, 2011, to which Dr. Simionescu has responded, doc. 52, and UAB has replied, doc. 53.

## DISCUSSION

Title VII precludes employers from discharging "any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion,

4

sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1); *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1288 (11th Cir. 2003).

Because Dr. Simionescu offers no direct evidence of discrimination to support his discriminatory termination claims and therefore must rely on circumstantial evidence,[4] in order to prove his *prima facie* case, Dr. Simionescu must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position from which he was terminated; (3) he was terminated; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. *Maynard*, 342 F.3d at 1289. Although UAB could have contested Dr. Simionescu's qualifications, instead, it relies upon the fourth element.

Because Dr. Simionescu does not allege or offer proof that he was replaced by a person outside his protected classes, if his gender and/or national origin-based termination claims are to survive summary judgment, he must satisfy the fourth requirement via the less favorable treatment theory by proving that a similarly situated female employee or a similarly situated employee who is not of Eastern European descent received more favorable treatment. *E.g. Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999).

---

[4] Dr. Simionescu admitted during his deposition that he did not hear any statements indicating bias against him based on his gender or national origin, and he does not argue in his response brief that he has direct evidence of discrimination.

The Eleventh Circuit has emphasized that comparators offered by a plaintiff for purposes of proving a *prima facie* case must be similarly situated to the plaintiff in all relevant aspects. *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

> In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. **We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions** and confusing apples with oranges.

*Maniccia*, 171 F.3d at 1368 (internal citations and parentheticals omitted)(emphasis added).

   As the court reads Dr. Simionescu's response brief, he points to his colleagues Drs. McInerny and Oliver as purported comparators, stating that they also each scored in the bottom (0-10) percentile in student evaluations for several classes they taught, but were not disciplined.  He also points in his brief to some negative student evaluations that Dr. Oliver received for one of her classes.[5]

_____

   [5] The majority of Dr. Oliver's student evaluations were positive, but some unfavorable comments she received that Dr. Simionescu included in his response brief are: "Typical Tina

The court finds that Drs. McInerny and Oliver are not similarly situated to Dr. Simionescu for purposes of his disparate treatment claim.  As an initial matter, Drs. Simionescu, McInerny and Oliver each held a different job ranking within UAB's mechanical engineering department.  Dr. Simionescu admitted that Dr. McInerny is a full professor and that Dr. Oliver was an instructor during the time Dr. Simionescu was an assistant professor, and in fact, that he was the only assistant professor in mechanical engineering at UAB during the relevant time frame.  Additionally, he admitted that while Dr. McInerny was hired with tenure, Dr. Oliver, as an instructor, was not on "tenure-track," while he was on "tenure-track."  Indeed, Dr. Simionescu admitted throughout his deposition that he has no real comparators.  The Eleventh Circuit has held that material differences in job ranks and responsibilities between a plaintiff and another employee is a relevant factor to be considered with regard to whether the two individuals can be compared for purposes of evaluating a discrimination claim.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d

---

Oliver class.  Easy, not required to put forth much effort.  Tina does not challenge her students."; "The teacher seems spiteful sometimes.  Something about her seems immature, unprofessional and dishonest."; "Dr. Oliver is a wonderful person but she is also the least prepared, least professional instructor I had so far."; "The professor was usually about 10 minutes late to class and was not fully prepared.  Also tests took about a month to be graded."; "It would be nice to know when the instructor is not going to be present for class, in advance."; "Everything she does seems thrown together at the last minute.  I have taken other classes from her and learned very little.".

1269, 1280 (11th Cir. 2008).  *See also Lathem v. Dept. of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.").  Dr. Simionescu has not argued, and the record is devoid of evidence, that despite their clear differences in job ranks, that Drs. McInerny, Oliver, and he were all subject to the same workplace rules or employment policies, such as to indicate that they were in similar positions.  *See Cyprian v. Auburn Univ. Montgomery*, 2011 WL 2618883, at *11 (M.D. Ala. July 1, 2011) (finding no valid comparators to plaintiff, former dean of student affairs at university, in part because plaintiff provided no evidence regarding the job ranks and responsibilities of the would-be comparators).

Moreover, there is no evidence that either Dr. McInerny or Dr. Oliver received complaints from students of the same degree as those Dr. Simionescu received.  Dr. Simionescu points to some unfavorable student evaluations that Dr. Oliver received, which generally complain about her lack of knowledge, unprofessionalism, and favoritism.  But based on the requirement that the quantity and quality of a comparator's alleged misconduct be "nearly identical" to that of a plaintiff, Dr. Oliver cannot be considered a valid comparator because she simply did not receive the same quantity of student complaints that Dr. Simionescu received, nor do the lesser

8

number of unfavorable evaluations Dr. Oliver received indicate teaching ineffectiveness as egregious as that reflected in the numerous complaints about Dr. Simionescu.  *See Cyprian*, 2011 WL 2618883, at *11-12 ("While this misconduct sounds similar to some of the allegations of misconduct against [plaintiff], 'misconduct merely 'similar' to the misconduct of the disciplined plaintiff is insufficient' to establish a claim of discrimination.") (quoting *Rioux*, 520 F.3d at 1280).  Furthermore, there is no evidence that students complained to other professors that Dr. Oliver or Dr. McInerny were ineffective teachers or that they received unfavorable performance evaluations by their department chairs.

Because Dr. Simionescu has failed to demonstrate that Drs. McInerny and Oliver exhibited misconduct that was "nearly identical" to the quality and quantity of Dr. Simionescu's misconduct such that they should have also been terminated but were not, they are not valid comparators for  purposes of his Title VII claim.  *See Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) ("Different types and degrees of misconduct may warrant different types and degrees of discipline . . . ."); *Wright v. Sanders Lead*, 217 F. App'x 925, 930 (11th Cir. 2007) ("If two employees are not similarly situated, then the different application of workplace rules to them does not constitute illegal discrimination").  Accordingly, Dr. Simionescu has not established a *prima facie* case of discriminatory termination because he has not

established that a similarly situated female faculty member or a
similarly situated faculty member not of Eastern European descent
who received a comparable number of student complaints and who
received a comparably poor performance evaluation for teaching was
treated more favorably than he.[6]

Even assuming for the sake of argument that Dr. Simionescu
established a *prima facie* case for gender or national origin-based
discriminatory termination, his claims would nevertheless perish
under the *McDonnell-Douglas* burden shifting analysis.   When a

---

[6]The court notes that, while not mentioned in his response
brief, Dr. Simionescu raised as comparators during his deposition
Christopher J. Waldren, Jason T. Kirby, and W. David Merryman,
testifying that these male, non-Eastern European faculty members
were treated more favorably than he with regard to receipt of
their promised start-up packages related to their obligation to
conduct research while employed at UAB.   However, none of these
professors were in the same department as Dr. Simionescu, and as
such, none reported to the same department chair.   Thus they are
not similarly situated to Dr. Simionescu under Eleventh Circuit
precedent.   *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d
1306, 1312 n.7 (11th Cir. 1998) ("[The fact that plaintiff's
purported comparators were under supervisors different from
plaintiff's supervisor] may be sufficient to prevent them from
being considered 'similarly situated' with Plaintiff."),
*superseded in other part by* 151 F.3d 1231; *Jones v. Gerwens*, 874
F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that
disciplinary measures undertaken by different supervisors may not
be comparable for purposes of Title VII analysis.").   More
importantly, Dr. Simionescu was not terminated for any reason
having to do with his research, but rather, for his poor teaching
performance and student complaints about his teaching.   And, Dr.
Simionescu did not state in his deposition or elsewhere that any
of these professors received the level of student complaints
about teaching that he did.   As such, whether these three non-
mechanical engineering professors received better treatment with
regard to their research start-up packages is not relevant to Dr.
Simionescu's discriminatory termination claims.

plaintiff has established a *prima facie* case, thereby raising an inference that he was the subject of discrimination, the burden shifts to the defendant to rebut this inference by articulating legitimate, non-discriminatory reasons for the termination. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). The defendant's intermediate burden is "exceedingly light," *id.* (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994)), and UAB has met this burden by presenting evidence which would allow a rational factfinder to conclude that Dr. Simionescu's termination was not based on a discriminatory reason, but rather on the legitimate reasons that he exhibited poor teaching performance and  received numerous student complaints.

Where the defendant meets the intermediate burden, the plaintiff has the opportunity to demonstrate that the defendant's articulated reasons for the adverse employment action are mere pretext. *Holifield,* 115 F.3d at 1565 (citing *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 804 (1973)); *Roberts v. Gadsden Mem. Hosp.,* 835 F.2d 793, 796 (11th Cir.1988). The Eleventh Circuit has stated:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to

> conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." The district court must evaluate whether the plaintiff has demonstrated **"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."**

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal citations and parentheticals omitted) (emphasis added).

Throughout his response brief, Dr. Simionescu offers a litany of complaints about UAB's mechanical engineering program generally, his supervisor Dr. Soni, his colleagues Drs. McInerny and Oliver, and his students, all in an apparent effort to show that UAB's reasons for terminating him are pretextual.[7] First, he states that UAB made it publicly known that it would be laying off personnel in June 2008, but nevertheless sustained Dr. Soni's salary and travel budget and promoted Dr. Oliver from instructor to assistant professor at a higher rate of pay. Additionally, he states, "The termination of Simionescu from UAB appears to be pretextual as UAB does not care about the education of its ME [mechanical engineering] students," citing as "evidence" in support of this

---

[7] Because Dr. Simionescu is proceeding *pro se*, the court will address all of the facts and allegations he raises in his response brief, despite his failure to specifically characterize all of them as evidence in support of pretext. *Lorisme v. I.N.S.*, 129 F.3d 1441, 1444 n.3 (11th Cir. 1997) (stating general rule that a court reads briefs filed by *pro se* litigants liberally).

contention the following: 1) students have made unfavorable comments about the mechanical engineering program, 2) Dr. Soni does not have a formal engineering education but rather a PhD in Applied Mathematics, 3) Dr. Oliver was promoted from instructor to assistant professor despite having taken the maximum allotted time—eight years—to earn her PhD, 4) "resources that were originally allotted to education were diverted to research i.e. an undergraduate study room of the ME department has been converted to a virtual environment facility," 5) Dr. Oliver is often absent from class unannounced or tardy for class, 6)Dr. McInerny stores her bicycle for extended periods of time in a lab which interferes with student instruction, and 7) Dr. Soni travels too much to attend to his local duties and comes unprepared to his classes.  Dr. Simionescu has not explained how this combination of facts and allegations about UAB or his colleagues has anything to do with his termination, nor has he established how it casts doubt on UAB's proffered legitimate reasons for terminating him.  *See Combs*, 106 F.3d at 1538.

In another area of his brief, Dr. Simionescu addresses his belief that Drs. Oliver and McInerny, and to some extent Dr. Soni, instigated student complaints against him to undermine his teaching and drum up reasons to get him fired.  For example, Dr. Simionescu asserts that Dr. Oliver instigated the student complaints about his choice to use a textbook that he co-authored for one of his

classes.   However, Dr. Simionescu's belief that these professors instigated student complaints appears to be pure speculation, as he cites to no evidence in the record that this actually happened, but rather, supports his position with more speculation.   For example, in support of his contention, he states that 1) student Sanjay Malkani was a "personal friend" of Dr. Soni; 2) student Kevin Holland was employed by the mechanical engineering department and reported to Dr. McInerny; and 3) students Ronald Scott Mayfield and Lawrence Korneghy were members of a traveling research team led by Dr. Oliver.   If any of these students indeed had personal or professional relationships with Drs. Soni, McInerny, or Oliver, Dr. Simionescu has offered no evidence that the mere fact of these relationships leads to the conclusion that the professors conspired with the students to undermine his teaching. *See Cyprian*, 2011 WL 2618883, at *15 (rejecting plaintiff's suggestion that her colleague's prior personal relationships with her supervisor and the university chancellor made the colleague biased against her, stating, "The sparse facts of a prior relationship are too thin a reed on which to base an inference that the relationship between [these individuals] inappropriately influenced the decision to dismiss Cyprian such that AUM's proffered legitimate reasons lack all credibility.").

Indeed, all three professors have denied instigating student complaints or having any knowledge of such behavior, and Dr.

Simionescu reluctantly admitted during his deposition that he did not have personal knowledge of Drs. Oliver or McInerny influencing students to make negative comments about him, and, in fact, repeatedly stated that he was speculating as to this issue. Thus, Dr. Simionescu lacks admissible evidence to contradict the affidavits of Drs. Oliver, McInerny and Soni stating that they were not aware of students being influenced to give negative feedback about him. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995)); *Silvera*, 244 F.3d at 1262 ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.").

Finally, throughout his response brief, Dr. Simionescu appears to quarrel with UAB's decision to fire him based on poor teaching performance and complaints from students by pointing out that the UAB faculty handbook states that in addition to classroom presence, teaching ability of a faculty member should also be evaluated based on his knowledge of a subject field, by emphasizing the favorable evaluations he received from some students, and by explaining why he believes he received negative feedback from many of his students. He explains that the unfavorable perception of his teaching by the students was due to UAB's general neglect of the

mechanical engineering undergraduate program; for example, students complained that he wrote his own notes for one of his classes, but Dr. Soni did not allow him enough time to write these notes by assigning him to teach a class in the summer of 2008 on short notice.

However, Dr. Simionescu's attempts to show that he was in fact a competent and effective teacher miss the mark, because even if UAB's decision to terminate him based on poor teaching performance was erroneous, Dr. Simionescu has failed to show that UAB fired him for an illegal, i.e. a discriminatory, reason, which is the only issue before the court on his Title VII claims. *See Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."); *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

Importantly in this case, "[t]he inquiry into pretext centers

upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield*, 115 F.3d at 1565.  Dr. Simionescu has admitted that he did in fact receive numerous complaints from students and a poor performance evaluation from his department chair.  His disagreement with these reasons does not establish pretext.[8]

In sum, Dr. Simionescu is unhappy with how he was treated by his supervisor and colleagues while employed at UAB, but he has not presented **any** evidence that his termination was motivated by discriminatory animus, either with regard to his gender or his national origin.  Assuming that Dr. Simionescu presented sufficient evidence to establish a *prima facie* case of discrimination, which he has not, he has not established that the legitimate reasons articulated for his termination by UAB are a pretext for unlawful discrimination.  Accordingly, Dr. Simionescu does not have

---

[8] Construing Dr. Simionescu's brief liberally, the only evidence the court finds that could remotely be considered to create an inference of national origin discrimination are the comments made by students that they could not understand Dr. Simionescu due in part to his inability to speak English fluently.  But comments made by students do not establish any discriminatory intent by UAB with regard to Dr. Simionescu, as students are not agents of the university.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 791-92 (1998) (invoking traditional agency principles to devise standards for employer liability pursuant to Title VII claims on ground that definition of "employer" in Title VII includes agents of employer); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (same); *Davis v. Monroe Co. Sch. Dist.*, 526 U.S. 629, 643 (1999) (addressing liability standard under Title IX for acts of students as "non-agents").

sufficient evidence of discrimination to survive judgment as a matter of law.

**CONCLUSION**

For the foregoing reasons, UAB's motion for summary judgment will be granted as to all of Dr. Simionescu's claims.  A separate order will be entered effectuating this opinion.

DONE this 13th day of October, 2011.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE